IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRY ALLEN,

*Plaintiff*

v.

BALTIMORE COUNTY BOARD OF
EDUCATION,

*Defendant.*

Civil Action No. ELH-21-1006

## MEMORANDUM OPINION

In this employment discrimination action, Terry Allen, a former instructor for the Marine Corps Junior Reserve Officer Training Corps ("JROTC" or "MCJROTC") at Franklin High School ("School" or "FHS") in Baltimore County, sued the Baltimore County Board of Education ("Board" or "BOE"), alleging age discrimination under both federal and Maryland law. *See* ECF 1 (Complaint).   In particular, Allen asserts that in 2020, at the age of 69, he was "forced . . . to retire or face termination and the loss of retirement benefits." *Id.* ¶ 42.  Therefore, he claims that he was constructively discharged by the BOE.

Count I asserts a violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*  Count II asserts a claim of unlawful age discrimination under the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2021 Repl. Vol., 2022 Supp.), § 20–606 *et seq.* of the State Government Article ("S.G."). Plaintiff seeks compensatory and punitive damages, attorney's fees, costs, "representation expenses," reinstatement or "'front-pay,'" and "other equitable appropriate relief including 'back pay.'" ECF 1 at 9.

Defendant has filed a post-discovery motion for summary judgment, pursuant to Fed. R. Civ. P. 56(b) (ECF 36), supported by a memorandum (ECF 36-1) (collectively, the "Motion") and fourteen exhibits. ECF 36-2 to ECF 36-15. The Board argues that plaintiff has failed to establish a prima facie claim of constructive discharge.  ECF 36-1 at 2.  According to the BOE, plaintiff "was not subjected to an objectively intolerable working environment sufficient to support his constructive discharge claim."  *Id.*  Rather, the BOE contends that plaintiff "voluntarily decided to retire."  *Id.*

Plaintiff opposes the Motion (ECF 41, the "Opposition"), supported by fourteen exhibits. ECF 41-1 to ECF 41-14.  He contends, *inter alia*, that there are disputes of material fact that preclude summary judgment.  ECF 41 at 1.  Defendant has replied.  ECF 44.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I. Factual and Procedural Background[1]

The JROTC program is governed by a Memorandum of Understanding ("MOU") between the United States Marine Corps ("USMC") and the Baltimore County Public Schools ("BCPS"). *See* ECF 36-2.  Notably, JROTC instructors are employees of the school district, not the USMC. *Id.* ¶ 4(b).  But, the MOU grants the USMC the authority to inspect and audit JROTC programs

---

[1] As discussed, *infra*, at summary judgment I must view all facts, including any reasonable inferences to be drawn from them, in the light most favorable to plaintiff as the nonmoving party.

Throughout this Memorandum Opinion, I cite to the electronic pagination for all submissions.  However, the electronic pagination may not correspond to the page number imprinted on a given submission.

for compliance with USMC standards, and to take remedial steps with regard to programs that are non-compliant. ECF 36-2, ¶¶ 9, 10.

Allen was born in late 1950.  ECF 36-4 (Allen Dep.) at 2 (Tr. at 8).[2]  He joined the USMC on January 19, 1969, and served for over 20 years in various positions, including as an ammunition and high explosives technician, as well as a recruiter. ECF 41-1 (Allen Dep.) at 5 (Tr. at 15-17). After retiring from the USMC, with the rank of Gunnery Sergeant,[3]  Allen interviewed for a position with the JROTC program for the 2008-2009 school year. *Id.* at 6. (Tr. at 20). He spoke with Kathy Schmidt, then the principal of FHS; Master Gunnery Sergeant Ron Allender, a JROTC instructor at FHS; and General Johnson,[4] a retired U.S. Army General who worked as the JROTC facilitator for the Board. *Id.* (Tr. at 20-21).

Plaintiff was hired by the Board as a JROTC Instructor, effective June 16, 2008, and was assigned to the School. ECF 36-6.[5]  His first day of service was July 16, 2008. ECF 41-1 at 6 (Tr. at 20). The terms and conditions of Allen's employment were governed by annual employment contracts between Allen and the Board. *See, e.g.,* ECF 36-7.  According to Allen, during his tenure

---

[2] The parties submitted separate excerpts from several of the same depositions.

[3] Allen did not specifically state at his deposition that he retired from the USMC with the rank of Gunnery Sergeant. But, both parties indicate that Allen held the rank of Gunnery Sergeant. Moreover, in the briefing, Allen is sometimes referred to as "Gunny." *See, e.g.,* ECF 36-4 at 18 (Tr. at 130).

[4] Allen did not know General Johnson's first name.  ECF 36-4 at 3 (Tr. at 21).  Nor was the Court able to locate the first name in the record.

[5] Allen's initial contract reflects that it was for the 2006-2007 term.  But, the parties agree that the contract contained a typographical error, and that the actual term ran from 2008-2009. ECF 36-4 at 4.

he "compiled a record of outstanding performance." ECF 1, ¶ 10; *see*, *e.g., id.* ¶ 14 ("tremendous 2015 evaluation"); ECF 1, ¶ 15 (Allen's 2016 evaluation "was glowing"); ECF 15 (Answer), ¶ 14 (Allen's 2014-2015 performance was rated "effective")[6]; *see also* ECF 1, ¶¶ 11-12, 16-20.

JROTC hierarchy is determined by the highest rank an instructor achieves during his time in active service. ECF 36-3 (Bennett Dep.) at 7 (Tr. at 30-31). Through most of his employment, Allen worked at FHS as the number two JROTC instructor, behind Allender. ECF 36-8 (McCusker Dep.) at 6 (Tr. at 33). However, Allender retired in July 2018. ECF 36-8 at 8 (Tr. at 48). For the 2018-2019 year, Allender was replaced by Patrick Lemming, who was then a recent FHS JROTC graduate and Marine reservist. ECF 36-8 at 8 (Tr. at 49); ECF 41-1 at 8 (Tr. at 39-40).[7]

The following personnel served during the 2019-2020 school year. Patrick McCusker was the principal of FHS. ECF 36-12 (Defendant's Interrogatory Answers) at 5. Assistant Principal Kieran O'Connell oversaw the JROTC program. ECF 36-8 at 15 (Tr. at 94). Colonel Michael Bennett served as the JROTC Facilitator. ECF 36-12 at 6; ECF 41-8 at 3. Master Sergeant Lloyd Jordan replaced Lemming and worked as the higher-ranked JROTC instructor, alongside Allen. ECF 36-8 at 9 (Tr. at 52-53). Lieutenant Colonel Mark Johnson was the regional director of the USMC JROTC. *Id.* at 14 (Tr. at 93); ECF 41-8 at 4.[8]

---

[6] Neither party submitted Allen's prior performance evaluations.

[7] At the deposition of Patrick McCusker, the FHS principal, McCusker spelled Lemming's last name as "L-e-a-m-i-n-g." ECF 36-8 at 28 (Tr. at 241).

[8] Unless otherwise indicated, references to the name "Johnson" refer to Lieutenant Colonel Mark Johnson, and not to General Johnson.

McCusker worked for the BCPS for more than 30 years.  ECF 36-8 at 3 (Tr. at 16).  In all, he was a principal for 21 years, and left the BCPS on July 1, 2021.  *Id.* (Tr. at 17).

Plaintiff alleges that, beginning in the summer of 2019 through the summer of 2020, he was targeted for termination because of his age. ECF 1, ¶¶ 22, 24.  Allen claims that in July 2019, he received a phone call from McCusker, who said:  "'I spoke with Colonel Johnson, and he wanted me to ask you how much longer you planned on working.'" ECF 41-1 at 12 (Tr. at 59). Allen claims that, thereafter, McCusker asked him for updates on his retirement "pretty much every month." *Id.* (Tr. at 61).

The USMC conducted an inspection of the JROTC program on November 6, 2019. *Id.* at 7-8 (Tr. at 37, 38).  Bennett, Johnson, Allen, Jordan, O'Connell, McCusker, Lemming, the cadets, and two parents were present. *See id.* at 8 (Tr. at 38, 39).  As discussed, *infra*, in January 2020 the USMC issued notification of the probationary status of the JROTC program at FHS, due to its failure to maintain acceptable enrollment. ECF 41-14 at 2.[9]

Although the JROTC program was fully staffed as of November 5, 2019, Allen heard Johnson say on that date that Sergeant Major Jason Kappen would eventually be hired. ECF 41-1 at 17 (Tr. at 98-99).[10]  Soon after, on November 13, 2019, Johnson and Bennett exchanged emails, on which McCusker was copied, regarding the hiring of Kappen as a "long term investment."  ECF

---

[9] Other than ECF 41-14, the Court has not been provided with any USMC records as to the results of the November 2019 inspection.

[10] In the record, Kappen's name is spelled variously as Kappan, Kappen, and Cappen. I shall use the spelling of Kappen, consistent with his USMC email address. *See* ECF 41-6 at 2.

41-4 at 2.  But, Johnson said that "Allen is going to have to retire."  *Id.*   As discussed, *infra*, Kappen was hired to replace Jordan before plaintiff left the School in June 2020.  ECF 36-11 at 6.

McCusker claims that in December 2019, he first became aware of Allen's interest in retirement. ECF 36-8 at 23 (Tr. at 168).  However, Allen paints a different picture as to McCusker's knowledge in December 2019 and as to Allen's alleged desire to retire.  He claims that, on Jordan's suggestion, he "walked up to" McCusker in December 2019 and said: "'I realize I'm being forced to retire . . . Is there any changes at this point that I can stay here.'" ECF 41-1 at 11 (Tr. at 57). Allen avers that McCusker said, *id.*: "'Nothing has changed.'"

In January 2020, Bennett and McCusker arranged a meeting with Kappen for April 2020. ECF 41-5 at 2.  But, neither Jordan nor Allen was informed about it.

On or about March 1, 2020, Jordan gave notice that he was leaving the JROTC program for another job. ECF36-8 at 9-10. A long-term substitute was brought on to assist Allen with the JROTC program for the remainder of the year. ECF 41-7 at 6-7. Around this time, in March 2020, Allender "was informed that the ROTC program was not doing well and was asked to return as instructor number one." ECF 36-11 at 7. Also in March 2020, McCusker told Allender that if Allender were to return, Allen would retire. *Id.*[11]

---

[11] Significantly, in the backdrop of this sequence of events, the COVID-19 pandemic had begun to affect the schools. FHS shut down around February 13, 2020, ECF 36-4 at 15, and "no one was allowed in the schools for many months." ECF 36-8 at 11. Indeed, in March and April of 2020, text messages between Bennett and McCusker concern the adaptability of the JROTC program and Allen to the new remote learning environment. ECF 41-7 at 2-5.

In April 2020, O'Connell asked Allen, "'What do you think about retiring?'" ECF 41-1 at 13 (Tr. at 76).[12] Allen responded: "'I'm not real happy to be forced to retire.'" *Id.* He added, *id.*: "'How would you like to be forced to retire?'" According to plaintiff, O'Connell "just kind of shrugged . . . ." *Id.* On April 24, 2020, Allender interviewed for the "number one" JROTC instructor position at FHS. ECF 36-11 at 7.

A series of electronic communications concerning the replacement of Allen, discussed in more detail below, took place beginning in early May of 2020 and ending upon Allen's retirement in late June of 2020. *See, e.g.,* ECF 41-7 at 9; ECF 41-10 at 2; ECF 41-12 at 2.

In an email of May 8, 2020, from Johnson to McCusker, Kappen, Bennett, and O'Connell, ECF 41-6 at 2, Johnson wrote (emphasis added):

> Pat, I just got off the phone with GySgt Allen. I very politely let him know that there was not a place in MCJROTC for SY20/21. He asked if he could stay through the summer. I said that it was up to the principal but that I would have no problem with him staying to help get the SgtMaj and MGySgt oriented. *He kept asking me if I was putting him out because of his age. I did not fall into that bear trap.* I simply said there is no longer a position available. Franklin is set. Chesapeake is set. Parkville is fine with MSgt Ruffin on his own. I recommend someone give the gunny some pre-retirement counseling. *Not sure he really understands that it's over.* He asked about his certification. I told him that nobody is pulling his certification. However, as I have told both you and Col Bennett in the past, if I have to play hardball I can have his certification pulled simply on military appearance. I do not want to play that card. I want Gunny Allen to go out on a positive note.

As the school year was coming to an end, Allen and McCusker scheduled a meeting for June 24, 2020. ECF 36-11 at 5.  The morning of the meeting, McCusker texted Allender, stating, ECF 41-13 at 2: "Because Terry is refusing to retire, he is a few hours away from being fired in order to make room for you to return." Allender forwarded that message to Allen, which Allen

---

[12] Allen stated that O'Connell may have not used these precise words. ECF 41-1 at 13.

claimed strengthened his "feeling that [he] need[ed] to retire or get fired." ECF 36-4 at 13 (Tr. at 93).

O'Connell attended the meeting between Allen and McCusker.  ECF 36-8 at 17 (Tr. at 105).  McCusker claims that at the meeting he discussed expectations for the upcoming school year with Allen, and claimed that Allen "understood his duties and was going to stay for the upcoming 2020-2021 school year." ECF 36-11 at 6.  In contrast, Allen stated that "they discussed offboarding." *Id.* at 5.[13] Allen retired the next day, on June 25, 2020. *See id.* at 6.  Allen submitted a written resignation on July 8, 2020 (ECF 36-13), which was effective on September 1, 2020. ECF 36-14.

Sometime before June 24, 2020,  Kappen was hired to replace Jordan as the senior JROTC instructor. *See* ECF 36-11 at 6 (In June, McCusker told plaintiff that new number one instructor had been hired); *see also* ECF 41-9 (McCusker Dep.) at 4 (Tr. at 67-68).  On an unspecified date, FHS also hired Master Sergeant Jerice Leeks as the junior JROTC instructor, to fill the vacancy left by Allen. ECF 41-9 at 4-5 (Tr. at 69, 90).  According to Allen, Leeks was approximately 45 years old in the summer of 2020. *Id.* at 5 (Tr. at 90-91)*; see also* ECF 1, ¶ 32.

On June 25, 2020, Allen lodged a complaint of age discrimination with the BCPS Department of Human Resources ("HR"), Office of Equal Employment Opportunity ("EEO"). ECF 36-11 at 1.  Allen appears to have signed the complaint on June 19, 2020.  *Id.* at 3.  He alleged that on November 5, 2019, McCusker and Johnson told him to retire, due to his age and "getting

---

[13] Allen sometimes used the word "offboarding" to refer to "retirement." ECF 41-1 at 11 (Tr. at 56); *id.* at 12 (Tr. at 61).

up in years." ECF 36-11 at 2. He added, *id.*: "I feel I am under tremendous pressure to retire and be replaced by 2 younger Marine Corps JROTCC Instructors." *Id.*

Allen's EEO complaint was investigated by Kashina Shields, an HR Specialist in the BCPS EEO Office. *Id.* at 4-13 ("EEO Report" or "Report"). During the course of the investigation, Shields interviewed Allen, McCusker, Bennett, and Allender. *Id.* at 4-10. She also reviewed exhibits, which included a text message thread between Allender and McCusker and Allen's employment contract. *Id.* at 12-13.[14]

Among other things, McCusker denied that Allen was told to retire because of his age. ECF 36-11 at 5. Rather, the discussions pertained to plaintiff's performance. *Id.* Moreover, he claimed that he did not have "total authority" to terminate a JROTC instructor. *Id.* at 6.

According to the EEO Report, Bennett indicated that the November 2019 USMC investigation reflected that plaintiff "failed to teach from the curriculum, had low enrollment for the program, and students were not in proper uniforms." ECF 36-11 at 7. Moreover, although plaintiff was always the number two instructor, Bennett claimed that Allen "was responsible for the failed inspection because he had been in-charge of the program . . . ." *Id.*

Furthermore, the Report states that in December 2019, Bennett offered Allen a job as a JROTC instructor at another school, which Allen believed to be Woodlawn High School, so he declined the offer. *Id.* at 4. Bennett also offered Allen a job at Parkville High School, but Allen declined that offer as well. *Id.* at 5. And, the EEO Report reflects that Allender was told by

---

[14] The text message thread between Allender and McCusker, ECF 36-11 at 12, is also proffered by plaintiff at ECF 41-12.

McCusker that Allen "was going to be transferred to another BCPS school or a school in a neighboring county." ECF 36-11 at 7.

On October 28, 2020, Ms. Shields sent a letter to Allen informing him that the evidence uncovered through the investigation did not show that he was discriminated against based on his age. ECF 36-15; *see also* ECF 36-11 at 10.  The Report states that the evidence was "insufficient" to support a finding that McCusker engaged in age discrimination.  ECF 36-11 at 10.  Shields stated, in part, *id.*:  "No witnesses corroborated that Lt. Col. said Complainant was old and should retire."  She also noted that Allen was offered positions at other schools, but declined to take them. *Id.*  And, she stated, *id.*:  "[T]here was no harm in Principal McCusker disgusting [sic] options of retirement . . . ."

However, the Report found that "misconduct" had occurred. ECF 36-15. In particular, the report concluded that McCusker failed to maintain the confidentiality of plaintiff's personnel information. *Id.*

This suit followed on April 3, 2021. ECF 1. Additional facts are discussed, *infra*.

## II. Legal Principles

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party

must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; accord *Knibbs v. Momphand*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).

But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Rather, "there must be evidence on which the

jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations. *Brown v. Lott*, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). But, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x. 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citing

13

*United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x. 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997). At the same time, if testimony from a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x. 209, 212 (4th Cir. 2017).

## B. The ADEA

Congress enacted the ADEA in 1967 "'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *EEOC v. Balt. Cnty.*, 904 F.3d 330, 333-34 (4th Cir. 2018) (quoting 29 U.S.C. § 621(b) ) (alteration in *EEOC* ); *see also Spivey v. Mohawk ESV, Inc.,* No. 21-1749, 2023 WL 3918674, at *1 (4th Cir. June 9, 2023). The statute makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see Hartman v. Univ. of Md. at Balt.*, 595 F. App'x. 179,

181 (4th Cir. 2014) (per curiam); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).The ADEA's protections are "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

The Supreme Court has ruled that, unlike Title VII, the ADEA does not permit "a mixed-motives age discrimination claim." *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 175 (2009). Rather, given that ADEA liability hinges on discrimination "because of ... age," 29 U.S.C. § 623(a)(1) (emphasis added), the plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action." *Gross*, 557 U.S. at 177; *see also Hartman*, 595 F. App'x. at 181 (citing *Nassar*, 570 U.S. at 343).  In other words, "an employee cannot prevail on an age discrimination claim by showing that age was one of multiple motives for an employer's decision; the employee must prove that the employer *would not have* [taken the adverse employment action] in the absence of age discrimination." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (emphasis in original).

To state a prima facie claim of employment discrimination under the ADEA, a plaintiff must allege: "(1) he 'is a member of a protected class'—that is, 40 years or older; (2) he 'suffered an adverse employment action'; (3) he 'was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open' or he was replaced by a substantially younger person." *Bodkin v. Town of Strasburg, Va.,* 386 F. App'x. 411, 413-14 (4th Cir. 2010) (per curiam) (alterations in *Bodkin*) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)); *see also Palmer v. Liberty University, Inc*., 72 F.4th 52, 63 (4th Cir. 2023); *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006).

15

### C.  Constructive Discharge

As mentioned, in an ADEA case, a plaintiff must prove an adverse employment action. Constructive discharge is a form of adverse employment action. *See Boone v. Goldin*, 178 F.3d 253, 255–56 (4th Cir. 1999).

The Supreme Court has explained, *Green v. Brennan*, 578 U.S. 547, 555 (2016): "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). And, a plaintiff must actually resign because of those conditions. *Green*, 578 U.S. at 555. When an employee "resigns in the face of such circumstances," the "resignation [is] tantamount to an actual discharge." *Id.*  Notably, both elements must be satisfied for a plaintiff to prevail.  *Id.*[15]

Therefore, "[t]o establish a constructive discharge, a plaintiff must show 'that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign' and that she actually resigned." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Green,* 578 U.S. at 555); *see also Chapman v. Oakland Living Ctr., Inc*., 48 F.4th 222, 235 (4th Cir. 2022) (claim of constructive discharge requires objectively intolerable working conditions); *Equal Emp. Opportunity Comm'n v. Consol Energy, Inc*., 860 F.3d 131, 144 (4th Cir. 2017) (same).  A court evaluating a constructive discharge claim must

---

[15] The Supreme Court has said that a claim of "constructive discharge resulting from . . . 'hostile work environment'" is only "one subset of Title VII constructive discharge claims." *Suders*, 542 U.S. at 143.

consider whether an employee's workplace was so intolerable that, under an objective "reasonable person" standard, he was compelled to resign. *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (citation omitted).[16]

The intolerability requirement is a "high bar." *U.S. Equal Emp. Opportunity Comm'n v. Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 753 (D. Md. 2021). The conditions of the plaintiff's work must go "beyond 'ordinary' discrimination." *Evans*, 936 F.3d at 193 (quoting *Suders*, 542 U.S. at 147). It "is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (citations omitted). Rather, "intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign, . . . that is, whether he would have had *no choice* but to resign." *Id.* (internal quotation marks and citations omitted) (emphasis in *Perkins*); *see Burks v. Okla. Pub. Co.*, 81 F.3d 975, 978 (10th Cir. 1996) ("This court has recognized that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired.").

Without more, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a

---

[16] In the Motion, defendant argued that to prevail on a claim of constructive discharge under the ADEA and MFEPA, Allen "'must prove (1) that the employer's intentional actions were motivated by age bias and (2) that the working conditions were objectively intolerable.'" ECF 36-1 at 15 (citing *Alba v. Merrill Lynch & Co.*, 198 F. App'x. 288, 294 (4th Cir. 2006)). But, plaintiff correctly noted in the Opposition that this standard has since been abrogated, and deliberativeness is no longer required. ECF 41 at 17. In Reply, defendant acknowledges its error. ECF 44 at 4. But, defendant contends that plaintiff cannot show that the Board's alleged discrimination on the basis of age was the "'but for' cause of any adverse action." *Id.* at 5 (citing *Krpan*, ELH-12-2789, 2013 WL 4400475, *8).

reasonable person to resign." *Heiko*, 434 F.3d at 262 (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004)). Allegations such as yelling by supervisors, receiving poor evaluations, being chastised in front of customers, "even if true, do not establish the objectively intolerable working conditions necessary to prove a constructive discharge." *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004).

In determining whether a resignation was, in fact, a constructive discharge, courts consider "the totality of the circumstances." *Bodkin,* 386 F. App'x. at 413. And, "the frequency of the conditions at issue" is an important consideration when assessing intolerability. *Evans*, 936 F.3d at 193 (citation omitted). "The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.*

Judges in the District of Maryland have recognized that "[c]onstructive discharge may occur where 'an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated[.]'" *Jones v. United Health Grp.*, JKB-17-3500, 2019 WL 1903668, at *8 (D. Md. Apr. 29, 2019) (quoting *EEOC v. MVM, Inc.*, TDC-17-2864, 2018 WL 2197727, at *12 (D. Md. May 14, 2018)), *aff'd*, 802 F. App'x. 780 (4th Cir. 2020); *see Williams v. Am. Lumpers Servs., LLC*, GLR-20-1342, 2021 WL 4942677, at *9 (D. Md. Oct. 22, 2021) (concluding that statements by plaintiff's supervisor, *inter alia*, that plaintiff "'no longer worked" for the defendant were sufficient to state a claim for constructive discharge even though plaintiff "failed to allege that he was 'actually terminated.'").

"Under this theory, an environment in which an employer makes clear to an employee her termination was imminent and that 'the axe was about to fall' may be objectively intolerable."

18

*Decoster v. Becerra*, TDC-21-2195, 2022 WL 3083343, at *4 (D. Md. Aug 3, 2022) (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)); *see also Hunt v. City of Markham,* 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with his employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable."). However, "[a] 'working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background.'" *Hodge v. North Carolina Department of Public Safety*, MR-20-16, 2021 WL 2652953, at *5 (W.D. N.C. June 28, 2021) (quoting *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010)).

### D.  Methods of Proof

Plaintiff bears the burden of proving his ADEA claim by a preponderance of the evidence. In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination *at trial*. But, these two avenues of proof may help to inform a court's evaluation of the evidence at the summary judgment stage. *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x. 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill*, 354 F.3d at 284, *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

The first avenue of proof is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d

208, 216 (4th Cir. 2016) (discussing the three steps of the McDonnell Douglas framework).[17] It established a proof scheme, characterized as "a procedural device, designed only to establish an order of proof and production." St. *Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993). Notably, "the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  Moreover, under the *McDonnell Douglas* approach, the "ultimate burden of persuasion ... never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

"To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original). In *Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the showing that is required to withstand summary judgment via ordinary principles of proof.

Direct evidence must be "'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'"

---

[17] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII. However, the burden-shifting methodology has been adapted for use in cases of alleged discrimination in other statutory contexts. *See, e.g., Raytheon Co. v. Hernandez*, 540 U.S. 44, 50-52 & n.3 (2003) (applying *McDonnell Douglas* framework in ADA employment discrimination case); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (en banc) (applying *McDonnell Douglas* framework to employee's claim of age discrimination under ADEA). *But see Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 175 n. 2 (2009) (observing that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* ... is appropriate in the ADEA context").

*Bandy v. City of Salem, Virginia*, 59 F.4th 705, 711 (4th Cir. 2023) (quoting *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action.

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Under the *McDonnell Douglas* approach, if a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse action. *Hoyle v. Freightliner*, LLC, 650 F.3d 321, 336 (4th Cir. 2011). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Dawson v. Washington Gas Light Co.*, 2021 WL 2935326, at *4 (4th Cir. July 13, 2021) (internal quotations and citation omitted). In presenting a legitimate, non-discriminatory reason for a plaintiff's termination, a defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). Instead, the defendant's explanation "must be legally sufficient to justify a judgment for the defendant." *Id*. at 255. And, the defendant's reason must be both "clear and reasonably specific" to meet its burden. *Burdine,* 450 U.S. at 258.

If the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. *See also Adams v. Trs. of Univ. of N. Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove 'both

that the reason was false, and that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll*., 57 F.3d 369, 378 (4th Cir. 1995) ) (emphasis in original). In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr*., 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '***both*** that the reason was false, and that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll*., 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, ***taken as true***, would ***permit*** the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.,* 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id*. at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

22

However, the relevance of the prima facie case under *McDonnell Douglas* at the summary judgment stage is limited. The Fourth Circuit has admonished district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). The Court has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*,'" and that, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination." *Merritt*, 601 F.3d at 294-95 (citation omitted).

On occasion, when the employer proffers evidence of a legitimate reason for its adverse action in its motion for summary judgment, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case. *See, e.g., Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

Plaintiff has indicated that he "need not determine at this stage whether he will prove his case using direct or circumstantial evidence." ECF 41 at 13 n. 2.  He points to some direct evidence of age bias. *Id.* at 19.  However, Allen also argues that the *McDonnell Douglas* prima facie standard

applies with respect to the Motion, noting that defendant has only argued for summary judgment on the basis that Allen cannot satisfy the second prong of a prima facie age discrimination claim. ECF 41 at 14.

### III. Discussion

### A. ADEA Claim

Allen argues that he has "has direct evidence of age bias through Johnson's comments connecting Plaintiff's need to retire to his advanced age and McCusker's concurrence with this statement," made in connection with the USMC inspection at FHS in November 2019. ECF 41 at 19. Direct evidence of age discrimination has been described as evidence that the employer "announced[] or admitted" to age discrimination in connection with an adverse employment action. *Cline v. Roadway Express, Inc*., 689 F.2d 481, 485 (4th Cir. 1982). In addition, plaintiff relies on the alternative proof scheme articulated in *McDonnell Douglas*.

### 1.

As a threshold matter, defendant argues that Johnson's conduct cannot be used to support plaintiff's ADEA claim, because Johnson was not an employee of the Board, nor was he able to terminate Allen's employment. ECF 36-1 at 17; *see also* ECF 44 at 5. Rather, Johnson was employed by the USMC as the regional director of the JROTC program. *See* ECF 36-3 at 7 (Tr. at 31).

Johnson's status as an employee of the USMC does not necessarily insulate defendant from Johnson's allegedly discriminatory remarks and actions. In *Kluge v. Brownsburg Community School Corp.,* 364 F.4th 861, 892 n. 17 (7th Cir. 2023), the court noted: "[A]n adverse employment action based on the discriminatory preferences of others, including coworkers and customers, is

24

unlawful." *See also E.E.O.C. v. C.R. England, Inc*., 644 F.3d 1028, 1039 (10th Cir. 2011) ("[W]e acknowledge that an employer's accommodation of the discriminatory preferences of other employees, clients, or customers could, under certain circumstances, expose the employer to liability for discrimination."); *Pleener v. New York City Bd. of Educ*., 311 F. App'x. 479, 482 (2nd Cir. 2009) ("[F]ederal law does not permit an employer to discriminate based on race to accommodate the actual or perceived invidious biases of its clientele."); *Mesnick v. General Elec. Co*., 950 F.2d 816, 826 (1st Cir. 1991) (stating that "the intentions of a third party may not be attributed to an employer without *some rational basis for attribution*").

The record contains evidence that indicates that both Johnson and Bennett were quite involved with the JROTC program at FHS. It also includes communications between the administrators at the School and representatives of the USMC concerning matters such as JROTC instructor recruitment and discharge, as well as program management. *See, e.g.,* ECF 41-4; ECF 41-5; ECF 41-6; ECF 41-7; ECF 41-8. Indeed, Bennett acknowledged that, at the relevant time, he served "as a conduit" between the USMC and BCPS with respect to facilitating "introduction[s]" with potential hires for JROTC instructor positions, as well as reviewing "personnel record[s]" to advise on the "quality" of JROTC instructor applicants. ECF 36-3 at 5 (Tr. at 23); *see also* 36-1 at 4.

Johnson sent an email to Bennett on November 13, 2019, with a copy to McCusker, stating that Allen "is going to have to retire!" ECF 41-4 at 2. Johnson persisted. Several months later, on May 8, 2020, Johnson sent an email to McCusker stating that he "very politely let [Allen] know that there was not a place" for him at JROTC for the 2020-2021 school year. ECF 41-6 at 2. He

also offered his "assistance" to McCusker in June 2020 in regard to terminating plaintiff. ECF 41-8 at 3-4.

JROTC instructors are BCPS employees, not USMC employees. ECF 36-2, ¶ 4(b). But, the MOU requires the BCPS to "coordinate with the Regional Director for Marine Corps prior to hiring any MCJROTC instructor in order to ascertain whether or not that instructor is certified . . . ." *Id.* ¶ 4(a). The MOU also requires the BCPS to "inform" the USMC, in writing, of any changes to employment status of any JROTC instructions and any disciplinary action. *Id.* ¶ 4(f). In addition, the MOU provides that the senior JROTC instructor is to be included "in meetings where policies, recommendations, or decisions affecting the MCJROTC program are made, including the employment or discharge of Marine Instructors." *Id.* ¶ 4(b).

In the Board's response to interrogatories, the Board identified Bennett, McCusker, and Homer McCall, "one of the higher folks in the HR department" (ECF 36-8 (McCusker Dep.) at 21 (Tr. at 136-137)), as "having knowledge of the hiring of Sergeant Major Kappen in order to fill a vacancy in the JROTC program" at the School. ECF 36-12 at 12. Defendant identified the same individual as having knowledge of Leeks's hiring. *Id.* at 13.

In the light most favorable to plaintiff, there is a symbiotic relationship between the BCPS and the USMC in the conduct of the JROTC program at FHS. *See Bynum v. Fort Worth Indep. Sch. Dist.*, 41 F. Supp. 2d 641, 654 (N.D. Tex. 1999). Therefore, for the purpose of the administration of the JROTC program, a jury could conclude that the Board adopted or chose to accommodate the alleged discriminatory preference of Johnson and/or Bennett.

**2.**

"Derogatory comments about an employee's age may be direct evidence of age discrimination, provided they concern the employee's age and sufficiently demonstrate that the employer's age-related animus affected the employment decision at issue." *Arthur v. Pet Dairy*, 593 F. App'x. 211, 218 (4th Cir. 2015) (per curiam) (citing *Merritt*, 601 F.3d at 300).

The Fourth Circuit has adopted "the Fifth Circuit's test from *Jackson v. Cal-Western Packaging Corp*., 602 F.3d 374 (5th Cir. 2010), to determine whether derogatory comments were direct evidence of age discrimination." *Bandy*, 59 F.4th at 711. "Under *Jackson*, derogatory comments constitute direct evidence of discrimination if they are '(1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the complained-of adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue.'" *Id.* (cleaned up) (quoting *Jackson*, 602 F.3d at 380); *see also Cole v. Fam. Dollar Stores of Md., Inc*., 811 F. App'x. 168, 175 (4th Cir. 2020).

As noted, Allen testified at his deposition about comments made during the USMC's inspection of the School's JROTC program in November 2019, at which Johnson and McCusker were present.  ECF 41-1 at 8 (Tr. at 38).  Allen recalled, *id.* at 9 (Tr. at 44-45) (emphasis added): "Colonel – Lieutenant Colonel Johnson during the – I guess you would utilize it as the debrief, said, 'Gunny, you need to retire this year. You're up in age. You're getting old.' And it kind of caught me by surprise, and I looked over at Mr. McCusker and he said, '*And I concur*.' My response was 'I don't want to retire; I'm not ready to retire.'"  According to Allen, McCusker shrugged in response.  ECF 41-1 (Tr. at 45). And, as mentioned, Johnson sent an email to Bennett

on November 13, 2019, with a copy to McCusker, in which he stated that Allen "is going to have to retire." ECF 41-4 at 2.  Moreover, at McCusker's deposition, he was asked whether he concurred with Johnson that Allen "was getting up in age."  ECF 41-3 at 4 (Tr. at 205). McCusker responded: "Well, in the sense that everyone gets old with time."  *Id.*

As to the first prong of the *Jackson* test,  the alleged comments of Johnson and McCusker in November 2019, as well as Johnson's email in November 2019, are related to the class of persons protected under the ADEA. Similarly, the fourth prong is readily satisfied because the comments pertain to plaintiff's employment, and the desire for plaintiff to retire. *See* ECF 36-2, ¶ 4; *see, e.g., Cavazos v. United States,* 776 F.2d 1263, 1265 (5th Cir. 1985) (concluding that JROTC instructors were employees of the school district, not the government).

The Board disputes the second and third prongs of the *Jackson* test.

The second prong concerns the matter of temporal proximity between the November 2019 USMC inspection at FHS and Allen's departure in June 2020. Ordinarily, a gap of seven months is not regarded as temporally proximate. *See Barbee v. Isothermal Cmty. Coll*., MR-18-267, 2020 WL 6140554, at *5 (W.D.N.C. Oct. 19, 2020) (concluding that the "comments cited by the Plaintiff as direct evidence [of age discrimination] were made several months before he was terminated" and therefore not temporally proximate to the adverse employment action); *Cf. Granet v. Presidio, Inc*., JAG-19-821, 2020 WL 6147000, at *4 (E.D. Va. Oct. 20, 2020) (concluding that age-related comments made two days prior to plaintiff's resignation were temporally proximate); *Fagbuyi v. Prince George's County,* GJH-17-2876, 2018 WL 2290705, at *4 (D. Md. May 18, 2018) ("As Plaintiff has alleged that she was 'repeatedly' subjected to inquiries from her supervisor regarding her age and when she was going to retire, and that the same supervisor told a colleague that she

'hated to see [Plaintiff] around her' shortly before Plaintiff was terminated, Plaintiff has plausibly stated a claim for age discrimination by alleging direct evidence of discrimination.").[18]

However, in the absence of an immediate termination for cause, it is hardly uncommon for a school employee to leave employment at the end of the school year, rather than during the school term. In the context of this case, I decline to rule, as a matter of law, that seven months constitutes a fatal lack of temporal proximity.

As to the third prong, the BOE contends that neither Johnson nor McCusker had authority to terminate Allen. Therefore, according to the Board, comments made by either individual cannot constitute direct evidence of discrimination. ECF 44 at 6.

"The Fourth Circuit has adopted the cat's paw theory of liability in employment discrimination [] cases." *Ashanti v. City of Richmond Sch. Bd*, JAG-21-494, 2023 WL 1110300, at *9 (E.D. Va. Jan. 30, 2023) (citing *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x. 146, 155 (4th Cir. 2017)). "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by LaFontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990 . . . In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 n. 1 (2011). The "cat's paw" theory validates the possibility that individuals other than the final

---

[18] In *Fagbuyi*, 2018 WL 2290705, the exact timing between the allegedly discriminatory comments and the adverse employment action is unclear.. But, the plaintiff alleged that the remarks were made in "the summer of 2015," and on August 4, 2015, the plaintiff was issued a notice of her employer's intent to terminate her. *Id.* at *1. The plaintiff was terminated on September 3, 2015. *Id.* Thus, at most, there was a three month window between the alleged discriminatory remarks and plaintiff's ultimate termination.

decisionmaker may exert an influence on the outcome of an employment decision, thereby imbuing that decision with discriminatory animus that might otherwise be lacking. *See Staub,* 562 U.S.. at 416-422.

As such, the ADEA does not "limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer." *Hill,* 354 F.3d at 290. Indeed, "the person allegedly acting pursuant to a discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer for an adverse employment action, so long as . . . the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action." *Id.* at 288-89 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 151-52 (2000)).

As part of the EEO investigation of Allen's complaint, "Principal McCusker reported that he does not have ***total authority*** to terminate a ROTC instructor." ECF 36-11 at 6 (emphasis added). McCusker's use of the word "total" to qualify his "authority to terminate a ROTC instructor" suggests that he had at least some authority to terminate Allen. *Id.*

Moreover, the record contains facts that, if credited, would support the determination that McCusker had the authority to cause Allen's termination. For example, in a text message with Bennett on June 20, 2020, McCusker referenced a conversation he had with McCall, a BCPS employee in the HR department. *See* ECF 36-8 at 21 (Tr. at 136-37); *see also* ECF 36-12 at 5. Notably, McCusker stated, ECF 41-7 at 9: "[McCall] believes I have the ability to fire an ROTC instructor with just a few days notice." ECF 41-7 at 9. McCusker also wrote to Johnson and Bennett on June 22, 2020, stating: "I had hoped that he [(Allen)] would have started his offboarding process but he has not. Releasing him from his contract may be the best option at this point." ECF 41-8 at 4. And, on June 23, 2020, McCusker advised a colleague, Kim Willard who served as an assistant

principal at FHS, *see* ECF 36-8 at 20 (Tr. at 118), that Bennett would be assisting him "in terminating Terry Allen." ECF 41-12 at 2.

As indicated, Johnson sent an email to McCusker on May 8, 2020, stating that he (Johnson) "just got off the phone with GySgt Allen" and "very politely let [Allen] know that there was not a place" for him at JROTC for the 2021 school year. ECF 41-6 at 2. According to Johnson, in response, Allen "asked if he could stay through the summer." *Id.* Notably, Johnson wrote: "I said that it was up to the principal . . . ." *Id.* In other words, Johnson understood that it was McCusker who had the authority to determine plaintiff's employment status.

In an email from Johnson to McCusker on June 22, 2020, with a copy to Bennett, Johnson wrote: "Pat, I wish [Allen] could have gone out gracefully . . . . However, it's time. You are doing the right thing. Let me know if I can be of assistance." ECF 41-8 at 3-4. And, McCusker sent Allender a text message on June 24, 2020, stating, ECF 41-13 at 2: "Because Terry is refusing to retire, he is a few hours away from being fired in order to make room for you to return. If you are not returning, we may pull back from firing him."

It is also noteworthy that the principal's office was in charge of supervising the JROTC program, with specific oversight duties belonging to McCusker's direct subordinate, Assistant Principal Kieran O'Connell. ECF 36-8 at 15 (Tr. at 94). As mentioned, in June 2020, a day before Allen's resignation, McCusker met with O'Connell and Allen. ECF 36-8 at 17 (Tr. at 105). McCusker testified, *id.* at 18 (Tr. at 106): "So I laid out that we needed to turn things around, mentioned the lack of recruitment from the prior year and what needed to happen to have a presence at Franklin Middle School, our biggest feeder . . . ." Furthermore, McCusker approved Allen's resignation as the "Administrator/Supervisor." ECF 36-13; *see Westmoreland,* 924 F. 3d

at 728 (noting that a "jury could have found that . . . a supervisory official who had just broken the news to [an employee] of the firing and signed the termination paperwork as 'Supervisor/Manager,' was a decisionmaker"). McCusker also had the ability to begin the termination process by making "a recommendation to the executive director." ECF 36-9 (McCall Dep.) at 3 (Tr. at 30-31).[19]

In sum, there is ample evidence in the record from which a factfinder could conclude that McCusker had the authority to terminate plaintiff. *See U.S. ex rel. Bias v. Tangipahoa Parish Sch. Bd.*, 816 F.3d 315, 327 (5th Cir. 2016) (allowing a JROTC instructor's claim against the school board to proceed based on allegations that the principal "was acting within the scope of his employment, or at the very least, with the apparent authority of the School Board"); *see also See Neil v. Warren Cnty. Sch.,* LWF-20-595, 2022 WL 4467671, at *8 (E.D.N.C. Sep. 26, 2022). Moreover, in the light most favorable to plaintiff, the alleged comments of Johnson and McCusker at the November 2019 inspection, if credited, would constitute direct evidence of a derogatory comment concerning plaintiff's age and in relation to his employment.

Allen points to other communications that he claims reflect the School's desire for Allen to retire, and constitute, in his view, direct evidence of discrimination. ECF 41 at 19-20. However, comments regarding the School's desire for Allen to retire do not necessarily constitute direct evidence of age discrimination.

*Palmer*, 72 F.4th 52, is instructive. Beginning in 2016, Palmer, a university art professor who was in her seventies during the relevant time, *id.* at 60, began to receive poor performance

---

[19] From the record, it is unclear who served as the executive director during the relevant period.

reviews. *Id.* at 58. The university "emphasized the need for Palmer to improve her technology and digital art skills in order to teach digital art courses and to incorporate technology into her existing courses." *Id.* And, the Dean and Palmer's Department Chair recommended that she continue to develop her digital technology skills. *Id..* Beginning in the fall of 2017, the university questioned whether Palmer's contract should be renewed in light of her failure to improve her digital classroom skills, and the university's need for faculty members "who could teach both studio and digital arts courses." *Id.* at 59. The university administrators considered that Palmer could retire as an alternative to the nonrenewal of her contract. And, in the fall of 2017 Palmer's Department Chair sent the Dean "a document identifying Palmer as 'Retiring' for the 2018-19 school year, as opposed to indicating a 'Non-Renewal.'" *Id.* This was referenced as the "first retirement comment." *Id.*

In December 2017, the university's Provost suggested to the Dean that Palmer be given a year to improve her technology skills. *Id.* In an email, the Dean responded, stating "that Palmer would 'have great difficulty with any changes, and this would most likely exacerbate negative student experiences.'" *Id*. The Fourth Circuit regarded this as a "resistant-to-change comment." *Id.* Then, "in March 2018, the Provost remarked that he would consider characterizing Palmer's forthcoming nonrenewal as a 'retirement,' but only if Palmer brought up an issue of retirement in response to the nonrenewal." *Id.* at 59-60. This was characterized as the "second retirement comment." *Id.* at 60.

Ultimately, the university chose not to renew Palmer's contract. *Id.* She argued that the two retirement comments and the resistant-to-change comment established that her nonrenewal was a pretext for age-based discrimination. *Id.* at 63-64. The Fourth Circuit disagreed. *Id.* at 69.

33

The Court reasoned that "mere comments or inquiries about retirement — without more — fail to constitute direct evidence of age discrimination." *Id.* at 64. Although the Fourth Circuit did not clarify what constitutes "without more," the Court observed that the "retirement comments were not actually presented to" the plaintiff but instead were made during "internal deliberations about how to handle [the plaintiff's] nonrenewal if [plaintiff] brought up the possibility of retirement." *Palmer*, 72 F.4th at 64. Similarly, the Court noted that the comments about retirement were "devoid of any reference to [plaintiff's] age." *Id.*  And, the Court pointed to cases in other circuits where suggestions about retirement, made only after it was already determined that the employee was not meeting expectations, were not direct evidence of discrimination.  *Id.* at 64-65.

Here, the School's inquires to Allen about retirement did not include a reference to his age. Yet, there are differences between this case and *Palmer*.

For one, the Fourth Circuit observed in *Palmer* that the retirement comments occurred after the administrators determined that the plaintiff was not meeting the university's legitimate performance expectations. *Id.* at 65. In contrast, Allen avers that he was asked about retirement as early as July 2019, and defendant does not seem to claim that Allen failed to meet performance standards prior to that time. *See* ECF 41 at 4. Further, the plaintiff in *Palmer* cited to only two instances of retirement comments, as well as a single comment concerning resistance to change, whereas here, plaintiff contends that from July 2019 to June 2020, he was regularly asked when he would retire. *Id.* 4, 20.

Nevertheless, the inquiries about Allen's retirement, both internally and directly to Allen, are not direct evidence of age discrimination. Simply put, these inquiries do not, on their own, alleviate the need for a factfinder to draw inferences to determine discriminatory motive. *See*

34

*Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.").

In any event, I need not decide whether, as Allen contends, the record contains direct evidence of age discrimination. This is because an ADEA claim "can be premised on a circumstantial evidence theory." *Palmer*, 72 F.4th at 65. I turn to that inquiry.

**3.**

As noted, to state a prima facie claim of employment discrimination under the ADEA, a plaintiff must allege: "(1) he is a member of a protected class—that is, 40 years or older; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or he was replaced by a substantially younger person. *Bodkin,* 386 F. App'x. at 413-14.

**(a)**

Allen easily satisfies the first element. At age 69, he was a member of a protected class. *See* ECF 36-11 at 4.

**(b)**

With respect to the second element, whether Allen suffered an adverse employment action, the BOE observes: "The only cause of action asserted by Plaintiff in this action is one for constructive discharge." ECF 36-1 at 15. And, defendant maintains that Allen's claim for constructive discharge fails because he voluntarily resigned. *Id.* at 14-25.

35

The Board points to Allen's testimony "that he decided to retire on or about June 11, 2020." ECF 44 at 9.  According to the BOE, Allen's "decision to retire was voluntary because he made the choice, he had ample time to make it, he had the opportunity to choose his retirement date, and he declined to pursue the administrative review remedies provided in his contract." ECF 36-1 at 24.  To that end, the BOE notes that, under the "clear language" of Allen's employment contract, he had "the right to appeal any controversies or disputes he might have arising out of his employment contract under Md. Code Ann., Educ. § 4-205(c)." ECF 36-1 at 23-24.  Yet, Allen did not do so.

Further, the BOE contends that Allen "conceded" that "no member of the Superintendent's Office of Human Resources office [sic] communicated to him an intent to terminate his contract, and that neither McCusker nor the FHS Assistant Principal told him that he was being forced to retire." ECF 36-1 at 22 (citing ECF 36-4). According to the Board, Allen "retired due to nothing more than a 'subjective fear' that he would be terminated and lose his retirement benefits." ECF 36-1 at 22.[20]

Plaintiff counters that he has established a claim for constructive discharge because the record shows that he retired in order to avoid termination. ECF 41 at 14. In the Complaint, Allen stated, ECF 1, ¶ 29: "To avoid losing his retirement benefits, Allen was forced to apply for retirement effective as of August 31, 2020."  At his deposition, however, Allen was asked if there

---

[20] Defendant points the Court to *Rankin v. Greater Media, Inc.*, 28 F. Supp. 2d 331 (D. Md. 1997), and *Blakney v. N. Carolina A&T State Univ.*, WLO-17-874, 2019 WL 1284006 (M.D.N.C. Mar. 20, 2019), for the proposition that Allen's resignation due to his unfounded belief that he would lose his retirement benefits cannot constitute constructive discharge. ECF 36-1 at 20-22. But, both of these cases relied on the since-abrogated standard for constructive discharge. *See Green,* 578 U.S. at 555.

was a "factual basis" to indicate that his "retirement benefits were at risk" if he was "terminated." ECF 36-4 at 9 (Tr. at 67).  Allen stated: "No, Sir." *Id.*

The Court has already reviewed evidence pertinent to the desire of Johnson and McCusker for Allen to leave his JROTC position at FHS. I need not review all of it again. However, some of the evidence is relevant to more than one issue.  And, because of the centrality of the issue regarding an adverse employment action, I must revisit some of the evidence and point to the additional facts not yet discussed.

Allen testified that he "believe[d]" that he made the decision to retire on June 11, 2020. ECF 41-1 at 13 (Tr. at 74). But, he did not express certainty as to the precise date. And, he did not actually retire until June 25, 2020.

At his deposition, Allen was asked why he decided to retire.  He stated, *id.* (Tr. at 75): "One, I was fearful I was going to get fired based on the contract, and Mr. McCusker told me that he concurred that I needed to retire." *See also* ECF 36-4 at 9 (Tr. at 67) (Allen stating, ". . . my fear was that I was going to get fired. . . ."). Plaintiff also stated that, on a monthly basis, McCusker asked him about his "'offboarding package.'" ECF 41-1 at 13 (Tr. at 75).

As noted, as early as November 2019, Johnson and Bennett were interested in hiring Kappen for the JROTC program.  And, on November 13, 2019, Johnson sent an email to Bennett, with a copy to McCusker, stating that Allen "is going to have to retire." ECF 41-4 at 2.

In December 2019, Allen "walked up to" McCusker and said: "'I realize I'm being forced to retire . . . .'" ECF 41-1 at 11 (Tr. at 57).  Then, in April 2020, Allen told O'Connell, the assistant principal in charge of the JROTC program at FHS, that he was "'not happy to be forced to retire.'" ECF 41-1 at 13 (Tr. at 76). And, as noted, on May 8, 2020, Johnson sent an email to McCusker,

37

stating: "Pat, I just got off the phone with GySgt Allen. I very politely let him know that there was not a place in MCJROTC for SY2021." ECF 41-6 at 2. According to Johnson, in response, Allen asked "if he could stay through the summer." ECF 41-6 at 2. Also, McCusker allegedly continued to inquire as to Allen's plans for retirement. *See* ECF 41 at 5-6.

In the days leading up to Allen's retirement in June 2020, the School and the USMC exchanged a flurry of communications concerning Allen's termination. On June 17, 2020, McCusker sent a text message to the School's assistant principals stating, ECF 41-10 at 2: "I think the Marine Corps is going to force Terry's hand soon. It will be a bitter separation." Several days later, on June 20, 2020, McCusker sent a text message to Bennett indicating that, based on a conversation with McCall, McCusker had the authority to terminate a JROTC instructor "with just a few days notice." ECF 41-7 at 9.

McCusker sent an email to Johnson on June 22, 2020, with a copy to Bennett, stating, ECF 41-8 at 4: "It appears that Terry Allen can be given five days' notice that his contract is being terminated. I had hoped that he would have started his offboarding process, but he has not. Releasing him from his contract may be the best option at this point." In response, Johnson stated, ECF 41-8 at 4: "You are doing the right thing." Johnson followed up the next day, on June 23, 2020, stating to McCusker, *id.* at 2: "It's really as simple as telling him there is no longer a position available, because there is not."

Also on June 23, 2020, McCusker sent a text message to Willard. *See* ECF 36-8 at 20 (Tr. at 118). McCusker said, ECF 41-12 at 2: "FYI, Mike Bennett . . . is coming out tomorrow to assist me in terminating Terry Allen. Yikes." Willard responded, in part: "He's a grown up. He has seen it coming or at least he should have." Willard also said: "And I'm going to hide. Because if

he tried to hug me, I'll smell like my grandfathers [sic] old spice all day." *Id.* at 3.  McCusker responded with an emoji of a laughing face. *Id.*

Further, on June 23, 2020, Bennett sent a text message to McCusker, discussing the prospect that Allender might not return, in which case FHS would keep Allen for the 2020-2021 school year.  ECF 41-7 at 11. However, Bennett also said:  "We have to begin a strong document trail on him in the event we need to push him towards the door." ECF 41-7 at 11. Then, on June 24, 2020, just a day before Allen retired, McCusker sent a text message to Allender, stating, ECF 41-13 at 2: "Because Terry is refusing to retire, he is a few hours away from being fired in order to make room for your return." But, McCusker also stated that if Allender was "not returning, [the School] may pull back from firing" Allen. *Id.* Allender forwarded that message to Allen, and Allen claimed it strengthened his "feeling" that he "need[ed] to retire or get fired." ECF 36-4 at 13 (Tr. at 93).

At McCusker's deposition, he was asked whether he wanted to terminate Allen on June 23, 2020. McCusker replied, ECF 41-9 at 8 (Tr. at 158): "I wanted him gone one way or the other." Furthermore, in an undated text message, Allen wrote to McCusker and said, in part, ECF 36-8 at 25 (Tr. at 203): "'[Bennett] also said nothing has changed from the day of the inspection. I need to retire due to my getting up in age . . . .'" In response, McCusker did not acknowledge Allen's statement as to Allen's age and retirement, and instead focused on Allen's request to remain at FHS until the end of August and then possibly move to another school. ECF 36-8 at 25 (Tr. at 203-204).

In addition to communications described above, Allen relies on the USMC's willingness to have Allen's "**certification pulled**." ECF 41 at 6 (emphasis in original) (citation omitted); *see*

*also id.* at 5. The MOU states that "MCJROTC Instructors must be certified by TECOM to administer a MCJROTC program and teach the Marine Corps Leadership curriculum." ECF 36-1, ¶ 4(c).[21] "Once a JROTC instructor has been decertified, the "only viable option available to the School Board" is to "terminate his contract because he no longer could teach in the . . . school system." *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir.), *cert. denied*, 484 U.S. 827 (1987).

With respect to hiring a JROTC instructor, McCall stated, ECF 36-9 at 2 (Tr. at 22): "If we don't have the documentation from the military saying they're certified to be an instructor, that will be a stop-gate." *See Liles v. New York City Dept. of Educ.,* 516 F. Supp. 2d 297, 312 (S.D.N.Y. 2007) ("[O]nce Plaintiff [, a JROTC instructor,] was decertified by the Army, his termination was a foregone conclusion; indeed, it was required."); *see also Fileccia v. Caddo Parish Sch. Bd.,* EEF-15-2333, 2017 WL 2350451, at *4 (W.D. La. May 30, 2017) (noting that once the plaintiff JROTC instructor was decertified, "[h]is subsequent termination by [the school board] followed as a matter of course").

To be sure, Allen's certification was not revoked. But, in emails that included McCusker, Allen's certification was squarely threatened. For example, in an email from Johnson to Bennett on May 8, 2020, with a copy to McCusker, Johnson stated, ECF 41-4 at 2: "Colonel, I checked on the gunny's current certification. It expires June 2020. He is going to have to retire . . . There is no way I will endorse [Allen] getting recertified." In another email addressed to McCusker on May 8, 2020, Johnson stated, in part, ECF 41-6 at 2 (emphasis added):

---

[21] "The decision to decertify [a JROTC instructor] is fairly determined as incident to military service," and litigating the merits of decertification "would require this Court to wade into matters of military supervision and discipline." *Jones v. Shanahan*, PX-18-01678, 2019 WL 2341375, at *3 (D. Md. June 3, 2019) (citation and quotation omitted). A court may not undertake such a foray. *Aikens v. Ingram*, 811 F.3d 643, 648, 651 (4th Cir. 2016).

I recommend someone give the gunny some preretirement counseling. Not sure he really understands that it's over. ***He asked about his certification***.  I told him that nobody is pulling his certification. However, as I have told both you and Col Bennett in the past, if I have to play hardball ***I can have his certification pulled simply on military appearance.*** I do not want to play that card.

Significantly, plaintiff testified that he was aware of Johnson's power with respect to his certification. ECF 36-4 at 18 (Tr. at 130).

In sum, the internal communications referenced above, viewed in plaintiff's favor, support the inferences that the Board's representatives did not want Allen as a JROTC instructor at FHS; Allen's termination was imminent and inevitable; Allen did not want to retire; and Allen was aware of his fragile employment status. On these facts, a jury could readily conclude that FHS was directing Allen to the exit door, and that plaintiff resigned in lieu of termination.[22]

Thus, with respect to the second element, concerning adverse employment action, Allen has set forth facts from which a jury could find constructive discharge.

**(c)**

Plaintiff does not address the third element in the Opposition. Indeed, plaintiff notes that defendant "only argues for summary judgment based on the second element – whether Plaintiff was discharged." ECF 41 at 14. In other words, he claims that defendant does not argue that Allen failed to meet the employer's legitimate performance expectations.

Significantly, in the Complaint, Allen averred that he received multiple commendations for his work, including positive feedback from May 2018 to May 2020. *See* ECF 1, ¶¶ 16-20. But, at the summary judgment phase the Court relies on evidence in the record, not allegations in a

---

[22] Of course, this does not mean that defendant was pushing Allen out the door because of his age.

Complaint. And, plaintiff has not provided the Court with documentation of his accolades. Nevertheless, there is evidence in the record that supports the third element of Allen's prima facie case.

At McCusker's deposition, he was confronted with a text exchange that he had with Allen.[23]  According to the deposition, Allen asked McCusker whether he would support Allen's move to a different school, if there was an opening. ECF 36-8 at 25 (Tr. at 203). McCusker claims to have responded to Allen's query by stating, ECF 36-8 at 25 (Tr. at 204) (emphasis added): "' I would not have a problem with a move, sir. *You have a stellar reputation*. . . .'" And, Allen testified that in April 2020, a father of a JROTC cadet said to Allen, ECF 41-1 at 13 (Tr. at 77): "'I just want to thank you for what you've done for my daughter and building her self-confidence and leadership and all."

The parties do not seem to contest the issue of plaintiff's performance.  And, at this juncture, viewing the record in Allen's favor as the non-movant, the evidence supports an inference that Allen was meeting the Board's legitimate performance expectations at the time of his retirement.

### (d)

As to the last element of Allen's prima facie claim, Allen must show that he was replaced by someone substantially younger. "Courts within the Fourth Circuit generally hold that a plaintiff's replacement must be at least 10 years younger to be considered 'substantially younger.'" *Armitage v. Biogen Inc*., LCB-17-1133, 2019 WL 1789909, at *6 (M.D.N.C. Apr. 24, 2019)

---

[23] The Court did not locate the text exchange in the exhibits.  Although the precise date of the text message is not clear, it appears from the context of the exchange to have occurred shortly before Allen's retirement.

(quoting *DeBord v. Washington Cty. Sch. Bd.*, 340 F. Supp. 2d 710, 714–15 (W.D. Va. 2004) (collecting cases)).

Defendant appears to argue that the proper comparator is Allender, because the School avers that it sought to hire him to replace Allen. ECF 36-1 at 17-18. In doing so, defendant notes that Allender is only two years younger than Allen, and therefore not substantially younger. ECF 36-1 at 17-18. However, Allen was not replaced by Allender. Rather, by defendant's own admission, Allen was replaced by Leeks. *See* ECF 36-1 at 8; *see also* ECF 41 at 20.

Furthermore, it appears that Kappen was initially recruited to replace Allen. He was hired in the summer of 2020. ECF 36-8 at 13 (Tr. at 66-67). And, he is substantially younger than Allen, "in his mid-40s." ECF 41-1 at 17. But, Kappen was ultimately hired to replace Jordan, not Allen.

Leeks's precise age does not appear in the record. But, plaintiff alleges in the Complaint that "Leeks is in his 40s, more than 20 years younger than Allen." ECF 1, ¶ 32. And, McCusker stated at his deposition that Leeks was younger than McCusker, who was fifty-seven years old at the relevant time. ECF 36-8 at 14 (Tr. at 90-91). At a minimum, Leeks is more than twelve years younger than Allen. ECF 36-11 at 5. Thus, plaintiff has established that his replacement was substantially younger than he is.

Accordingly, the record contains ample support for Allen to establish the elements of a prima facie claim of age-based discrimination. Thus, the burden shifts to the Board to show that there was a nondiscriminatory reason for its constructive discharge of Allen. *See Guessous*, 828 F.3d at 216.

**4.**

Plaintiff has presented evidence that, if credited, establishes a prima facie case of age discrimination. Thus, the burden shifts to defendant to produce evidence of a legitimate, non-discriminatory reason for its adverse action. *Hoyle*, 650 F.3d at 336.

The BOE does not expressly argue that there was a legitimate reason to discharge Allen. To the contrary, defendant vigorously disputes that plaintiff was discharged. ECF 36-1 at 22. Rather, the Board insists that plaintiff voluntarily chose to retire. However, the record contains facts that could be construed to constitute a legitimate reason for seeking Allen's retirement, albeit unrelated to his age.

The Board references the unfavorable results of the USMC inspection in November 2019, the probationary status of the School's JROTC program, and Allen's role in regard to defects in the JROTC program. *See, e.g.,* ECF 36-1 at 11-12. The Board also asserts that "McCusker was frustrated by the uncertainty over the staffing of the FHS JROTC program" because it was unclear whether plaintiff would retire and if Allender would return. ECF 36-1 at 7.

Bennett indicated at his deposition that the JROTC program was placed on probation due the School's failure to meet enrollment criteria. *See* ECF 36-3 at 8 (Tr. at 35). A letter from the USMC to the School in January 2020 indicates that the program at FHS was placed on probationary status because of its failure to reach "enrollment of 100 cadets or 10% of the student population, whichever is less, throughout the academic school year." ECF 41-14 at 2. Although the letter itself does not attribute the enrollment issue to Allen, Bennett claimed during the Board's EEO investigation that Allen "failed" the "Marines inspection" in November 2019. ECF 36-11 at 7.

In particular, Bennett "reported" that the November 2019 inspection "revealed that [Allen] failed to teach from the curriculum, had low enrollment for the program, and students were not in proper uniforms." *Id.*  He also insisted that Allen "was responsible for the failed inspection because he had been in-charge of the program from the end of the 2018-2019 school year." *Id.* Moreover, Bennett asserted that the way Allen "was running the program was unacceptable." ECF 36-11 at 7. On this basis, a jury might conclude that the BOE sought to terminate plaintiff because he was not meeting legitimate performance expectations.

The Board also asserts that "McCusker was frustrated by the uncertainty over the staffing of the FHS JROTC program" because it was unclear whether plaintiff would elect to retire and also unclear as to whether Allender would return. ECF 36-1 at 7. The Board appears to justify McCusker's statements regarding Allen's potential termination as being rooted in a desire to shore up staffing for the upcoming school year, unrelated to Allen's age.

It is true that "[a]ddressing staffing shortages or other staffing needs is a legitimate, nondiscriminatory reason for an employment action." *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 334 (S.D.N.Y. 2020) (citation omitted).  Uncertainty as to staffing can be problematic for a school. Indeed, Bennett testified that the USMC has "lost programs" because of the "nonavailability of qualified or certified JROTC instructors." ECF 36-3 at 15 (Tr. at 83).  But, the Board does not argue that, to avoid a situation of an unexpected or last minute vacancy, it discharged Allen.

**5.**

I shall assume that the burden shifts back to plaintiff to show that the proffered reason was a pretext, and "not the true reason," and that Allen was "the victim of intentional discrimination." *Burdine,* 450 U.S. at 256. Regardless of whether Allen relies on direct evidence or circumstantial evidence, he must demonstrate that age-based discrimination was the "but-for" cause of his constructive discharge. *See Palmer,* 72 F.4th at 67. Allen has met his burden.

**(a)**

With respect with to the 2019 USMC inspection, Bennett stated at his deposition that he was unaware of how Allen deviated from the curriculum or in what ways the students were not properly in uniform. *See* ECF 36-3 at 12 (Tr. at 50-52).[24]

Additionally, Bennett testified that "ultimately the principal and the JROTC instructor" share responsibility for enrollment, *i.e.,* the reasons for FHS's JROTC program being placed on probation. ECF 36-3 at 8 (Tr. at 36). But, Allen's contract did not provide that it was his responsibility to ensure that the School's JROTC program met particular enrollment standards. *See* ECF 36-7. Further, the MOU states, ECF 36-2, ¶ 4(e): "The School District shall assign MCJROTC Instructors only those duties connected with the instruction, operation, and administration of the MCJROTC program."

Moreover, apart from 2018-2019, Allen was never the lead instructor. ECF 36-11 at 7. And, for the 2018-2019 school year, FHS utilized a recent high school graduate to serve as a junior

---

[24] Although Bennett acknowledged that there was a written evaluation form for the November 2019 inspection, the defendant did not submit it as an exhibit. ECF 36-3 at 9 (Tr. at 38).

instructor. ECF 36-8 at 8 (Tr. at 49). Arguably, this left Allen with an inexperienced co-instructor. ECF 36-1 at 5.

Also, there are facts to support the conclusion that Allen was a scapegoat. Indeed, Allen indicated that Jordan, the senior JROTC instructor for the 2019-2020 term, remarked that the purpose of the November 2019 inspection was to "character assassinate" Allen, not to inspect the program. ECF 41-1 at 14 (Tr. at 81). And, the evidence reviewed earlier, if credited, reflects that School administrators intended to terminate Allen if he did not retire.  Moreover, there is evidence that the School's reason was based on Allen's age.

As to the School's concern over staffing the JROTC program for the 2020-2021 school year, defendant's recruitment of Kappen began as early as November 2019. ECF 41-1 at 17 (Tr. at 98-99). At the time, Allen was one of two instructors. Even with Kappen in the wings to join the JROTC program, the BOE searched for an additional instructor after Jordan's departure, even though there was officially only one vacancy. ECF 36-8 at 12. Indeed, Leeks was ultimately hired to replace Allen, although the record is devoid of information as to when the defendant began to recruit Leeks for the JROTC instructor position.

Furthermore, when Bennett was asked at his deposition whether BCPS  was "in a position to be letting go of United States Marine Corp. JROTC instructors at this time," he responded, "I would say, no. . . ." ECF 36-3 at 15 (Tr. at 83). And, Allen testified at his deposition, ECF 36-4 at 18 (Tr. at 131): "McCusker did not want me there and he wanted two younger instructors, that I was the odd guy out because now they're setting the stage for their next go-around of instructors, which with them being in their mid-40s, would take them up to my age, which would give them

longevity when they know or feel that I might be retiring in two to three years, as I had said. And instructors are hard to come by out here . . . ."

**(b)**

Significantly, a plaintiff's "involuntary early retirement is not necessarily a violation of the ADEA; the statute prohibits employers' actions—coercive or otherwise—only when they are undertaken because of the employee's age." *Tavernier v. Health Mgmt. Assocs., Inc*., 498 F. App'x. 349, 351 (4th Cir. 2012). And, "ADEA plaintiffs face a high causation burden." *E.E.O.C. v. Surfside Realty Co., Inc*., JD-21-0139, 2023 WL 2706250, at *4 (D.S.C. Mar. 30, 2023) (citation and quotation omitted).

As discussed, the Supreme Court recognized in *Gross*, 557 U.S. at 173, that "the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." Rather, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Id*. at 177. Therefore, the "employee must prove that the employer would not have fired [him] in the absence of age discrimination." *Westmoreland*, 924 F.3d at 725 (alteration added). It is not enough to prove that "age was one of multiple motives" for the adverse employment decision. *Id.*

"However, for age to be the but-for cause, it need not be the sole cause of the adverse employment action." *Houston v. Kirkland*, GJH-15-2507, 2016 WL 7176580, at *9 (D. Md. Dec. 7, 2016) (internal quotation and citations omitted). Therefore, the remaining question is whether, "[w]hen drawing all inferences in [Allen's] favor, . . . a jury might ultimately conclude that age discrimination was the actual reason for the termination." *Harris v. Powhatan Cnty. Sch. Bd*, 543 F. App'x. 343, 349 (4th Cir. 2013).

The Board argues that McCusker, at age fifty-seven, was a member of Allen's protected class, which cuts against the notion that McCusker discriminated against Allen due to his age. ECF 36-1 at 17-18. It cites *James v. Verizon*, 792 F. Supp. 2d 861 (D. Md. 2011), to support its argument. ECF 36-1 at 18.

In *James*, 792 F. Supp. 2d at 869-70, the court said: "'Proof that the decision-maker is a member of the same protected class as [the complainant] weakens any possible inference of discrimination.'" (brackets omitted and alterations added) (quoting *Jackson v. Richmond City Sch. Bd.*, REP-99-642, 2000 WL 34292578, at *7 (E.D. Va. Mar. 15, 2000)). However, the plaintiff in *James,* 792 F. Supp. 2d 861, alleged race discrimination and the plaintiff in *Jackson,* 2000 WL 34292578, alleged gender discrimination. Such protected classes remain immutable throughout an individual's life. In contrast, an individual cannot, at birth, be a member of the class sought to be protected by the ADEA.

McCusker is more than a decade younger than Allen.  Therefore, a jury could conclude that defendant's argument is factually fallacious.  In any event, "'a member of a protected class may discriminate against fellow members.'" *Pilger v. D.M. Bowman, Inc*., 833 F. Supp. 2d 489, 497 (D. Md. 2011) (quoting *Saenger v. Montefiore Med. Ctr*., 706 F. Supp. 2d 494, 510 n. 9 (S.D.N.Y. 2010) (collecting cases)). Thus, McCusker's membership in the protected class would not defeat plaintiff's claim of age-based discrimination . *See Thornton v. Balt. City Bd. of Sch. Comm'rs*, WMN-07-1555, 2007 WL 9780551, at *6 (D. Md. Nov. 13, 2007) (quoting *O'Conner v. Consolidated Coin Caterers Corp*., 517 US. 308, 313 (1996)).

Defendant also argues that Allen admitted that his fellow employees were professional and that he was not subject to age-based harassment, which is at odds with a claim that age-based

discrimination was the cause of plaintiff's constructive discharge. *See* ECF 36-1 at 18. But, this argument is something of a red herring. None of Allen's claims requires harassment. To be sure, if defendant had engaged in conduct that constituted age-based harassment, it would strengthen Allen's claim.  But, Allen's admission that such conduct did not occur does not defeeat his case.

Even if the comments of Johnson and McCusker at the November 2019 inspection, and the School's inquiries about Allen's retirement, do not constitute direct evidence of age discrimination, or sufficient evidence, these occurrences are probative, under *McDonnell-Douglas*, in determining whether age was the but-for cause of plaintiff's constructive discharge. They need not be considered in a vacuum. Indeed, "'while it is true that an employer's friendly inquiries about retirement cannot usually support a finding of age discrimination . . . not all inquiries about retirement are friendly and . . . repeated and unwelcome inquiries may certainly be relevant to a showing of age discrimination.'" *Fagbuyi v. Prince George's County,* GJH-17-2876, 2020 WL 1063090, at *10 (D. Md. Mar 4, 2020) (quoting *Leonard v. Twin Towers*, 6 F. App'x. 223, 230 (6th Cir. 2001)).

Allen avers that he told the School on several occasions that he was not ready to retire. *See e.g.,* ECF 41-1 at 9 (Tr. at 45); *id.* at 11 (Tr. at 55-57); *id.* at 13 (Tr. at 75-77); *id.* at 14 (Tr. at 80); *see also* ECF 41-6 at 2.  Defendant's internal communications reveal several statements that relate to Allen's age, and suggest that it was the reason the School sought his retirement.  The repeated and unwelcomed inquiries about Allen's retirement could be construed to buttress the claim that plaintiff's age was the but-for cause of his constructive discharge.

Further, and as noted, Willard sent a text message to McCusker that stated, ECF 41-12 at 3: "If he [(Allen)] tried to hug me, I'll smell like my grandfather's old spice all day." McCusker responded with a laughing emoji. *Id.* at 3.

The BOE, through its agents and employees, also made several comments impugning Allen's technology skills, which could be considered age-related. McCusker texted Bennett to forward Allen a "Microsoft Teams invite." ECF 41-7 at 5. Bennett responded, ECF 41-7 at 5: "Yes, but no promises that he knows what that means." Further, McCusker stated, when discussing Allen's ability to conduct remote learning, that he hoped Jordan's replacement, a long-term substitute instructor, would be able to "pull Gunny a few steps up the savvy ladder." ECF 41-7 at 4.[25]

In May 2020, Allen asked Johnson if he "was putting him [*i.e.* Allen] out because of his age." ECF 41-6 at 2. Johnson emailed his colleagues, including McCusker and O'Connell, to inform them of Allen's question. *Id.* Johnson told them, *id.*: "I did not fall into that bear trap." Johnson's reference to a "trap" arguably suggests that he was attempting not to acknowledge that age was the basis on which the School sought plaintiff's retirement.

The various statements of defendant's representatives, in isolation, may not be sufficient for a jury to conclude that age discrimination was the but-for cause of Allen's termination. But, a jury may find that the incidents, considered collectively, demonstrate that plaintiff was constructively discharged because of age-related animus. *Cf. Dziwulski v. Mayor & City Council*

---

[25] The identity of this substitute instructor is unclear. But, McCusker stated at his deposition that the substitute may have been Lemming. ECF 36-8 at 11 (Tr. at 61). He is the only JROTC substitute instructor mentioned by name in the record. Lemming was either twenty or twenty-one years old. ECF 41-1 at 9 (Tr. at 43).

*of Baltimore*, DLB-18-277, 2020 WL 1034539, at \*7 (D. Md. Mar. 3, 2020) ("Thus, a reasonable jury, weighing the facts on the record . . . as to each employment decision one at a time, could find that no race-based discrimination occurred. Nonetheless, considering the combined effect of these decisions, which collectively 'undermine[ ] the credibility of the employer's stated reasons,' [plaintiff] has identified sufficient evidence of pretext to survive Defendant's Motion for Summary Judgment.") (internal citations omitted

Defendant, as the movant, bears the burden of demonstrating the absence of genuine disputes of material fact. Fed. R. Civ. P. 56(c)(1)(B); *see Celotex Corp.*, 477 U.S. at 325. And, the Court must view all of the facts and reasonable inferences in the light most favorable to plaintiff as the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587. In my view, there are multiple disputes of material fact that cannot be resolved by the Court. Accordingly, defendant's Motion as to Allen's ADEA claim is denied.

### B.  MFEPA Claim

Plaintiff also alleges age-based discrimination under the MFEPA. *See* ECF 1 at 8. The MFEPA provides: "***An employer may not*** fail or refuse to hire, ***discharge***, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of the individual's race, color, religion, sex, ***age***, national origin, marital status, sexual orientation, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment." S.G. § 20-606(a)(1)(i) (emphasis added).

The parties have not identified "a distinction between a federal and Maryland age discrimination claim" and therefore "the Court may apply the same standards to the analysis of the

state and federal discrimination claims." *Berger v. Baltimore County, Maryland*, LKG-22-64, 2022 WL 2116867, at *2 n. 3 (D. Md. June 13, 2022) (Title VII); *see also Avant v. Southern Maryland Hosp., Inc*., GJH–13–02989, 2015 WL 435011, at *9 n. 4 (D. Md. Feb. 2, 2015) (ADEA).

In the Complaint, Allen refers to his discussion of relevant events as "**FACTS COMMON TO ALL COUNTS**." ECF 1 at 2 (boldface and emphasis in original). In the absence of direct evidence of age discrimination "Maryland Courts have traditionally held that in employment discrimination actions, parties must engage in the four-part burden-shifting paradigm described by the United State Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973)." *Dobkin v. Univ. of Baltimore Sch. of Law*, 210 Md. App. 580, 592, 63 A.3d 692, 699 (2013); *see also Dep't of Natural Res. v. Heller*, 391 Md. 148, 171, 892 A.2d 497 (2006); *Price v. Giant Food, Inc*., 2019 WL 3302238, at 5-6 (Md. Ct. Spec. App. July 23, 2019); *Maryland Comm'n on Human Relations v. Kaydon Ring & Seal, Inc*., 149 Md. App. 666, 695–98, 818 A.2d 259 (2003).

Therefore, plaintiff's State law claim is properly analyzed under the same paradigm as his federal ADEA claim. *See Hartman*, 595 F. App'x. at 180; *Weil v. Sunrise Senior Living Management, Inc*., RDB-20-701, 2021 WL 5742383, at *4-6 (D. Md. Dec. 1, 2021). And, for the reasons discussed, defendant's motion for summary judgment is denied as to plaintiff's State law age discrimination claim, pursuant to MFEPA § 20–606.

## IV. Conclusion

For the foregoing reasons, I shall deny the Motion. An Order follows, consistent with this Memorandum Opinion.

Date: August 21, 2023                                      _____/s/_____

                                                                    Ellen L. Hollander
                                                                    United States District Judge